# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM S32545**

_____

**UNITED STATES**
*Appellee*

**v.**

**Kevin L. ROGERS**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 31 March 2020

_____

*Military Judge:* Mark W. Milam.

*Approved sentence:* Bad-conduct discharge, confinement for 6 days, reduction to E-3, and a reprimand. Sentence adjudged 8 June 2018 by SpCM convened at Edwards Air Force Base, California.

*For Appellant:* Lieutenant Colonel Anthony D. Ortiz, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before MINK, LEWIS, and D. JOHNSON, *Appellate Military Judges.*

Judge LEWIS delivered the opinion of the court, in which Senior Judge MINK and Judge D. JOHNSON joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

LEWIS, Judge:

A special court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of two specifications of indecent conduct in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §

934.[1,2] The military judge sentenced Appellant to a bad-conduct discharge, confinement for six days, reduction to the grade of E-3, and a reprimand. The convening authority approved the adjudged sentence.

Appellant raises five issues on appeal: (1) whether his conviction for indecent conduct towards Ms. ED is legally sufficient; (2) whether his conviction for indecent conduct towards Ms. DCH is legally and factually sufficient; (3) whether his bad-conduct discharge is an inappropriately severe sentence; (4) whether the record of trial was improperly authenticated; and (5) whether his conviction for indecent conduct towards Ms. ED is factually sufficient.[3]

After considering the fourth issue, we find this issue warrants no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We will address Appellant's first, second, and fifth issues together as they relate to the legal and factual sufficiency of his convictions. We find no prejudicial error and affirm the findings with one exception and the sentence.

## I. BACKGROUND

Appellant was enlisted in the United States Marine Corps (USMC) for more than nine years and reached the rank of Sergeant (E-5) before being honorably discharged. After a break in service, Appellant enlisted in the United States Air Force Reserve as a Staff Sergeant (E-5) and performed military duties at March Air Reserve Base (ARB), California. During his first few months of Air Force service, Appellant would often spend the week at March ARB for active duty or inactive duty for training (IDT) and would return to his home of record on the weekend.

When Appellant performed duty at March ARB during this time, he stayed at the installation's lodging facility, the March Inn. Appellant completed ten such stays between November 2016 and late January 2017 without incident. During these stays, Appellant became well known to the management and the

---

[1] Unless otherwise indicated, all references in this opinion to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The military judge acquitted Appellant of a third specification of indecent conduct and one charge and specification of stalking, in violation of Article 120a, UCMJ, 10 U.S.C. § 920a. For the two indecent conduct specifications of which Appellant was convicted, the military judge's findings excepted certain words and substituted other words.

[3] Appellant personally asserts issues (4) and (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

guest services representatives of the March Inn as he typically visited the front desk one or more times per day and said hello to all the employees.

On 30 January 2017, Appellant began a period of active duty and checked into the March Inn for a four night stay. On 1 February 2017, Ms. ED was the housekeeper assigned to clean Appellant's room.[4] ED had worked at the March Inn for 20 years as a housekeeper. When ED went to clean Appellant's room, she knocked on the door twice and announced "housekeeping" twice. ED testified she received no response so she entered Appellant's room with her master key.[5] Upon entry, ED testified she saw Appellant sitting on the sofa wearing his Airman Battle Uniform (ABU) with his pants "open all the way," his penis "protruding" but covered by his underwear. ED could not see the skin of Appellant's penis. ED testified she told Appellant to close the buttons of his pants and that Appellant replied "oops, I'm sorry," then stood up, but did not button his ABU pants. ED testified she did not report Appellant's behavior at this time.

ED testified that the next day—2 February 2017— she again went to clean Appellant's room, but moved the cleaning time to the end of her shift. ED testified she knocked twice and announced her presence but received no answer. Upon entry, ED testified she saw Appellant sitting on the sofa "the same way again" but with his "hand on his lap" and his head leaned to the side and one earbud headphone in his ear. ED testified she thought Appellant may have been sleeping. ED testified she saw Appellant's buttons on his pants were halfway open[6] and she could see the shape of Appellant's penis through his underwear. ED described Appellant's penis as "big." ED testified she told the now alert Appellant that he should put up the "do not disturb" sign if he wanted to take a nap. According to ED, Appellant responded by asking if she wanted to take a nap with him. ED testified she responded by telling Appellant that he

---

[4] ED testified with assistance of a translator as English was not her primary language.

[5] Appellant was charged with indecent conduct towards ED on divers occasions. The military judge acquitted Appellant, *inter alia*, of the words "on divers occasions" and "between on or about 1 February 2017" which meant the Government did not prove beyond a reasonable doubt that Appellant committed indecent conduct towards ED on more than one occasion. We include references to ED's testimony about cleaning Appellant's room on 1–2 February 2017 below to provide context. We understand the military judge convicted Appellant only of indecent conduct one time towards ED "on or about 3 February 2017." We make no findings of fact for any portion of this specification for which Appellant was acquitted. *See United States v. Bennitt*, 72 M.J. 266, 269 (C.A.A.F. 2013); c*f. United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (Defendants are generally acquitted of offenses, not of specific facts, and thus to the extent facts form the basis for other offenses, they remain permissible for appellate review).

[6] ED did not specify the type of pants Appellant was wearing.

shouldn't joke like that, that he should "be careful," and that "if you talk like that you'll make yourself awful." ED testified that she quickly cleaned Appellant's room, left, and reported Appellant to her lead housekeeper. ED testified she wanted Appellant to be moved to a different building so he would not be in her "area again."

When ED checked the housekeeping list the next day, 3 February 2017, she saw Appellant was still in the same room and that she was scheduled to clean it. She did not go back to the lead housekeeper but decided to clean Appellant's room at the end of her shift. When that time came, ED knocked three times on Appellant's door, louder than the prior two days, and received no response. Upon entry by ED, Appellant was sitting on the sofa "the same way" which she demonstrated for the military judge. Trial counsel described this demonstration as "the witness is sitting with her legs open so that her knees are [apart] just about as wide as they can go." Appellant's penis appeared "big" to ED underneath his underwear. On cross-examination, ED testified she "saw the penis elongated not a bulge." On redirect examination, ED clarified "[i]f it was not erected [sic] it would have not pointed up like that. It would have been a bulge underneath his underwear . . . ."

ED also testified Appellant looked at her, immediately closed his laptop and unplugged his headphones from the laptop. ED never explained whether she saw Appellant wearing the headphones. ED testified that she asked Appellant "do you want room service[?]" and then "told him" she was cleaning the room. As she began cleaning his room, Appellant stood up and started talking to her. Appellant said he "need[ed] help," "to do something." When ED asked what he needed help with, Appellant said he "needs [her] to help him do this" and then made a gesture with his hand. ED demonstrated Appellant's gesture which trial counsel described as "the witness raised her right hand in the air and moved her fist back and forth." ED interpreted this gesture that Appellant "wanted [her] to touch his penis." ED told Appellant "you really nasty." ED was "burning hot" mad at this point. She finished cleaning Appellant's room then walked around the building in an attempt to calm down.

Sometime on 3 February 2017, the lodging manager, Mr. MV, learned of ED's complaint about Appellant's behavior that was made on 2 February 2017. It is unclear exactly what time MV learned of ED's complaint so it may have been before or after ED cleaned Appellant's room on 3 February 2017. What is known is that MV's response to ED's complaint was to instruct the guest services manager, Ms. JM, to contact Appellant and inform him "this won't be tolerated; and if it happens again, we'll take further action and contact his leadership."

JM remembered calling Appellant on the phone "in February" on "the matter that happened with [ED]." JM told Appellant that ED "complained about

entering his room; and when ED entered the room, he had his pants open, and it was inappropriate." JM described Appellant's response as "he didn't think he was doing anything, but he would make sure that it doesn't happen again." The day and time of JM's phone call to Appellant are unknown.

At 1900 hours on 3 February 2017, Appellant departed March ARB for his home of record and arrived home two hours later for the weekend. Appellant would return to March ARB for his next set of active duty orders on 6 February 2017 where he again would stay at the March Inn.

A second housekeeper, Ms. DCH[7] testified about an incident with Appellant while she cleaned his lodging room, which the evidence showed was between 6 and 9 February 2017. DCH had been a housekeeper at March Inn for more than 14 years. DCH would cover for her co-workers on their days off which led to her assignment to clean Appellant's room. DCH knew definitively that the incident between Appellant and her occurred before Appellant moved lodging rooms from near the front desk to another building. There is no dispute that Appellant was told by March Inn management to move rooms on 8 February 2017 and he completed that move from a lodging room near the front desk to a lodging room in a different building on 9 February 2017.[8] Even though DCH did not recall the date of her incident with Appellant, the evidence at trial established it occurred between the date Appellant checked back into the March Inn on 6 February 2017 and the date he changed buildings on 9 February 2017.

Before the incident, DCH testified that she had already met Appellant twice, but he did nothing sexual to her.[9] DCH recalled a time when Appellant asked her for towels outside his room and tried to converse with her and one of her co-workers, Ms. CB. Another time, DCH testified that as she finished

---

[7] DCH also testified with the assistance of an interpreter.

[8] Appellant's change of rooms was not related to DCH. It appears to be a combination of ED's complaint and the report of a female March Inn guest services representative that Appellant followed her on 7 February 2017 and attempted to touch her even though she had rebuffed his advances. March Inn management learned of the guest services representative's complaint on 8 February 2017. The military judge acquitted Appellant of one charge and specification of stalking the guest services representative, an alleged violation of Article 120a, UCMJ.

[9] Appellant was charged with indecent conduct with DCH on divers occasions. After the Government rested its findings case, the military judge granted an unopposed defense motion for a finding of not guilty under R.C.M. 917 to the words "on divers occasions" on this specification. We include a portion of DCH's testimony only to provide context for DCH's later trial testimony. We make no findings of fact for any portion of this specification for which Appellant was acquitted. *See Bennitt*, 72 M.J. at 269.

cleaning Appellant's room, he invited her to "have a beer with him" after she "finished work."

On the day of the incident, DCH knocked multiple times on Appellant's lodging room door and announced "housekeeping." DCH received no response so she opened the door with her master key and saw Appellant standing in his room. DCH asked him if he wanted her to come back later. The transcript does not indicate whether Appellant responded, but DCH explained the reason for her question was "it's better to clean [a room] when no one is around." DCH recalled Appellant wearing "the pants that military personnel use." As DCH started cleaning the room, she saw "out of the corner of [her] eye" that Appellant had sat down, his "zipper was open" and Appellant "was touching himself" by "rubbing on his intimate part." DCH clarified that she meant Appellant was touching "his penis" and she also saw he "had his cell phone in the other hand." DCH demonstrated how Appellant was "rubbing" and trial counsel described it as "the witness took her right hand and put [it] on top of her left hand and sort of with the palm went around in circles." DCH did not look at Appellant directly "out of embarrassment," "because of what he was doing."

As DCH finished cleaning Appellant's room, she asked him "if he needed anything else, needed something extra[?]" Appellant responded that he "always needed something extra" and began laughing in a manner that DCH described as "cynically" and "mocking." DCH explained Appellant's comments further as "[i]t's just the way he said [it] when I was leaving when I was getting out of the room. Like irony, like sarcastic. It's like a person who always needs to be sexually active." In response to a question by the military judge, DCH explained that she believed "at that moment [Appellant] was inviting [her] to have [a] sexual relationship with him, relations with him." DCH clarified it was first "because of the way" Appellant said the words, and then "because of the words" themselves.

On 9 February 2017, MV—the lodging manager—was walking towards his vehicle in the parking lot outside the March Inn. Appellant shouted MV's name and approached him. Appellant wanted "to discuss why he was being moved" and commented that it made "him look like a pervert, judged by others" and he "didn't want to be perceived that way." MV informed Appellant that "no one was aware of it except for [MV himself] and management." Appellant told MV that he "had been sleeping" and it won't happen again. At the time of this conversation, MV did not know about the incident with DCH.

The next day, after he moved rooms, Appellant again approached MV as MV walked to his vehicle in the March Inn parking lot. Appellant asked MV "what happens if someone walks in again." MV told Appellant "[t]hat's what the do not disturb sign is for." After Appellant moved buildings, March Inn

management imposed a rule that two housekeepers had to be present to clean Appellant's room.[10]

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Background

For the indecent conduct conviction involving ED, through counsel, Appellant asserts the evidence is not legally sufficient because his conduct was not indecent. He argues his conduct was not overtly sexual and compares the facts in his case to more egregious facts from convictions that have been upheld on appeal. He also challenges whether "sexually implicit conduct" can be indecent.

Appellant personally asserts that his conviction involving ED is not factually sufficient because he "was wearing a T-shirt at the time, his pants were up at his waist level, it was unlikely that [ED] would be able to see his penis, and there was conflicting testimony on whether he had an erection." Appellant also argues that ED's "facility with the English language" and the differences in culture could "lead her to misinterpret, at a minimum the 'sexually implicit' comment made to her."

Appellate government counsel argues the conviction involving ED is legally and factually sufficient. The Government characterizes Appellant's conduct with ED as "both overtly and clearly sexual in nature." The Government asserts "the determination of whether an act is indecent requires examination of all the circumstances, including the age of the victim, the nature of the request, the relationship of the parties, and the location of the intended act." *See United States v. Rollins*, 61 M.J. 338, 344 (C.A.A.F. 2005) (citation omitted). The Government then argues we should look *inter alia* at the location of the conduct, a lodging room on a military installation, and that Appellant propositioned ED while wearing part of his military uniform. The Government elaborates that Appellant

> purposefully did not answer when Ms. ED knocked on his door, rendering her an unknowing victim as she opened the door to find Appellant prepositioned on a sofa with his legs and knees spread as wide as possible, his ABU pants unbuttoned, and his erect penis visibly protruding underneath his underwear.

---

[10] The military judge acquitted Appellant of a third specification of indecent conduct in July 2017 after the two-housekeeper rule was instituted. This allegation involved housekeepers, but did not involve ED or DCH.

The Government disagrees that cultural differences caused ED to misunderstand Appellant's behavior as Appellant's words and gestures provided a "universal interpretation" that he wanted ED to masturbate his erect penis. Finally, the Government points out that ED could tell that Appellant's penis was "big" and "elongated" even if his pants were at his waist as his pants, knees, and legs were all wide open.

On the indecent conduct conviction involving DCH, Appellant asserts that it "cannot be held as legally or factually sufficient" as (1) DCH testified that she did not actually see Appellant rub his genitals; (2) his comment to DCH was "at worst" sexual innuendo; and (3) the facts do not establish an exact timeframe. On the first point, Appellant elaborates that DCH only saw Appellant "out of the corner of her eye" and never saw his penis. Appellant also points us to the cross-examination of DCH where she was asked "[y]ou're not positive whether [Appellant] was rubbing his thigh or somewhere close to his groin" and answered "No." On the second point, Appellant claims the sexually implicit comment that he "always needed something extra" was at worst sexual innuendo, and not indecent under the Manual for Courts-Martial definition. Appellant also challenges DCH's interpretation of his expression and comments as sexual in nature and argues that "irony and sarcasm are not crimes in the military nor in any other American jurisdiction." On the third point, Appellant claims for the first time on appeal that the offense against DCH did not occur during a period of active duty or inactive duty training as DCH provided unclear testimony on when this incident occurred.

The Government responds to the first point by arguing that DCH did not need to look at Appellant directly as she saw all she needed to out of the corner of her eye. According to the Government, DCH did not need to see Appellant's exposed penis to know, based on his motions in a certain area of the body, that he was masturbating. On the second point—regarding the cross-examination question on whether Appellant was rubbing his thigh or somewhere close to his groin—the Government points us to DCH's earlier testimony and argues she made it quite clear Appellant was "touching himself" and "rubbing on his intimate part." On the third point, the Government argues that the evidence of Appellant's active duty orders, his lodging receipts from the March Inn, and testimony of the witnesses demonstrate that Appellant was on active duty at the time of this offense.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

For the indecent conduct offense involving ED, a violation of Article 134, UCMJ, the Prosecution had to prove beyond a reasonable doubt based on the military judge's findings[11] that (1) on or about 3 February 2017, at or near March ARB, California, Appellant engaged in certain conduct to wit: making sexual gestures by moving his hand in an up and down motion and making sexually implicit comments to ED while he was in a state of undress; (2) that the conduct was indecent; and (3) that, under the circumstances, the conduct was of a nature to bring discredit upon the armed forces. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 90.b.

For the indecent conduct offense involving DCH, also a violation of Article 134, UCMJ, the Prosecution had to prove beyond a reasonable doubt based on

---

[11] The military judge found Appellant guilty by exceptions and substitutions of the specification involving ED. Specifically, Appellant was found not guilty of the words "on divers occasions," and "between on or about 1 February 2017 and on or about 3 February 2017, wrongfully commit indecent conduct to wit: making sexual gestures and comments." The substituted words are contained above in our recitation of the elements of the offense.

the military judge's findings[12] that (1) between on or about 6 February 2017 and on or about 8 February 2017, at or near March ARB, California, Appellant engaged in certain conduct to wit: rubbing his genitals or groin area in front of and then making sexually implicit comments to DCH; (2) that the conduct was indecent; and (3) that, under the circumstances, the conduct was of a nature to bring discredit upon the armed forces. *See id.*

"Indecent" means that form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations. *MCM*, pt. IV, ¶ 90.c.(1).

"Indecent conduct includes offenses previously proscribed by 'Indecent acts with another' except that the presence of another person is no longer required." *MCM*, pt. IV, ¶ 90.c.(2). Under the prior offense of indecent acts with another, "[t]he determination of whether an act is indecent requires examination of all the circumstances, including the age of the victim, the nature of the request, the relationship between the parties, and the location of the intended act." *Rollins*, 61 M.J. at 344 (citation omitted). "[A]cts not inherently indecent . . . may be rendered so by the accompanying words and circumstances." *United States v. Wilson*, 13 M.J. 247, 250 (C.M.A. 1982) (citation omitted) (evaluating the offense of indecent assault, a violation of Article 134, UCMJ, prior to 1 October 2007). "The definition of indecency requires consideration of both the circumstances of the act itself and societal standards of common propriety." *United States v. Burkhart*, 72 M.J. 590, 596 (A.F. Ct. Crim. App. 2013) (citation omitted) (discussing indecent act, a violation of Article 120(k), UCMJ, 10 U.S.C. § 920(k), in effect from 1 October 2007 to 27 June 2012).

Service discrediting conduct is "conduct which has a tendency to bring the service into disrepute or which tends to lower it in the public esteem." *MCM*, pt. IV, ¶ 60.c.(3).

### 3. Analysis

#### a. Indecent Conduct towards ED

Appellant argues his conviction for indecent conduct towards ED is legally insufficient as it was not overtly sexual and that sexually implicit conduct does

---

[12] After the Government rested, the military judge granted the Defense's Motion for A Finding of Not Guilty under R.C.M. 917 to the words "on divers occasions" on the specification involving DCH. When the military judge announced his findings, for the second time, he found Appellant guilty by further exceptions and substitutions of the specification involving DCH. Appellant was found not guilty of the words "rubbing the genitals in the presence of, and making inappropriate comments to," in this specification. The substituted words are contained above in the elements of the offense.

not meet the definition of indecent. We disagree. Appellant's comments and gestures towards ED, taken together, are explicitly sexual in nature. We also conclude based on all the circumstances that Appellant's comments and gestures during his last interaction with ED meet the definition of indecent.

The determination of indecency "requires examination of all the circumstances." *Rollins*, 61 M.J. at 344 (citation omitted). We do not view the words spoken or the gestures made to see if each one is indecent standing alone. Instead, we evaluate all the circumstances including the words spoken by Appellant; the gestures that he made immediately thereafter; his state of undress with his ABU pants being unbuttoned; the condition of his penis being elongated, pointed up, and visible through his underwear to ED; the location—an Air Force lodging room—that ED's job required her to clean; that ED gave Appellant no indication of consent; that ED was an adult; and their lack of a prior relationship.

We conclude the military judge had ample evidence, drawing every reasonable inference from the evidence of record in favor of the Prosecution, to conclude that Appellant's conduct was indecent beyond a reasonable doubt. When ED opened Appellant's lodging room door, he sat with his legs spread wide and an obvious erection visible through his exposed underwear. Appellant chose to stand up, approach ED while she was cleaning his room, engage her in conversation, tell her he needed her help, and then undeniably demonstrate to her via sexual gestures that the help he needed was for her to masturbate his penis. Considering all the circumstances, the military judge could have found Appellant's conduct represented a form of immorality relating to sexual impurity which was grossly vulgar, obscene, and repugnant to common propriety and tended to excite sexual desire or deprave morals with respect to sexual relations.

On the final element of the offense, given the nature of Appellant's conduct and to whom he directed it—ED, an on-duty Air Force employee—the military judge could have reasonably found Appellant's conduct had a tendency to bring the Air Force into disrepute or lower the Air Force's image in the public esteem.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of indecent conduct towards ED beyond a reasonable doubt. *See Barner*, 56 M.J. at 134 (citations omitted).

For factual sufficiency, Appellant personally argues that it was unlikely ED was able to see his penis and there was conflicting testimony on whether he had an erection and that language and cultural differences led ED to misinterpret the sexually implicit comment. We disagree. On the first point, the Government only needed to prove beyond a reasonable doubt that Appellant

was "in a state of undress," not that ED could see his penis. We are convinced the Government carried its burden on this element despite trial defense counsel's attempts to show the laptop or Appellant's other clothing could possibly have blocked ED's view. On the second point, we considered the cross-examination of ED which attempted to challenge whether Appellant actually had an erection. While trial defense counsel extensively questioned ED on this point, her testimony indicated Appellant's penis was elongated and pointed up. On his final point, we considered whether the language and cultural differences demonstrated in the trial transcript affects our own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt while accounting for the fact that we did not see or hear ED testify. We agree with the Government that Appellant's sexual gestures and words about needing ED's help were not misunderstood. Appellant clearly communicated exactly what he wanted from ED.

In our factual sufficiency review, we also considered Appellant's statements to March Inn management. When JM confronted Appellant on the telephone about a complaint by ED that he acted inappropriately, Appellant's response was "that he didn't think he did anything wrong." On the other hand, the first time Appellant sought out MV in the parking lot, he claimed to be "sleeping" which, if true, would also have been an important fact for JM to know. Finally, we highlight MV's testimony regarding the second time Appellant approached him in the parking lot. Appellant wanted to know what would happen if someone walked in again. MV pointed out the obvious to Appellant that he had a "do not disturb" sign available to prevent such a future incident. So too, we must state the obvious that Appellant could have prevented the entire incident with ED by using his "do not disturb" sign and we conclude his failure to do so was not a mere oversight but was instead evidence of his intent.

Having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for indecent conduct towards ED is both legally and factually sufficient.

### b. Indecent Conduct towards DCH

According to Appellant, DCH did not actually see Appellant rub his genitals. We disagree. DCH described both what she saw Appellant doing and the manner in which she was able to observe his actions—out of the corner of her eye. DCH testified that she saw Appellant "touching himself" and "rubbing his intimate part" which she later clarified was his penis. She demonstrated the circular rubbing motion Appellant used with his right hand while he held his cellphone in the opposite hand. We find DCH's reaction to not want to look

directly at Appellant to be completely understandable under the circumstances. As DCH testified, she was embarrassed "because of what he was doing" with his pants open.

Appellant attaches particular importance to one question asked by trial defense counsel on cross-examination and DCH's answer. The question was "[y]ou're not positive whether [Appellant] was rubbing his thigh or somewhere close to his groin" and DCH answered "No." In closing argument, trial defense counsel argued "she can't even say that he was actually rubbing his penis or his genitals." The military judge found Appellant guilty of, *inter alia*, "rubbing his genitals or groin area."

We do not share Appellant's view that this line of cross-examination is significant. Instead, we observe one confusingly worded cross-examination question with no follow-up questioning. On the latter point, trial defense counsel did not ask DCH whether it was possible Appellant was rubbing his thigh. He also did not ask DCH "you are not positive he was rubbing *his genitals*?" These questions or others may have clarified how certain DCH was about what she saw. Trial defense counsel did not ask those questions and we do not know whether the answers would have supported or refuted Appellant's claim that DCH did not see him rubbing his genitals. For legal sufficiency, we must draw every reasonable inference from the evidence of record in favor of the prosecution, *Barner*, 56 M.J. at 134 (citations omitted), and the evidence does not have to be free from conflict. *Wheeler*, 76 M.J. at 568 (citation omitted). The military judge's finding that Appellant was "rubbing his genitals or groin area" is well supported by the record.

Appellant argues his comment to DCH was at worst "sexual innuendo" which does not rise to the level of indecency. Appellant is mistaken that the words he spoke are evaluated in isolation from his actions and the words must be indecent on their face without context. The determination of indecency "requires examination of all the circumstances." *Rollins*, 61 M.J. at 344 (citation omitted). This means we evaluate the words spoken by Appellant, his tone; the testimony that he began rubbing his genitals or groin area with one hand while his cellphone was in the other hand; that he was wearing pants that "military personnel use;" the location—an Air Force lodging room—that DCH's job required her to clean; that DCH gave Appellant no indication of consent; that DCH was an adult; and their lack of a prior relationship. We see one minor point that weighs in Appellant's favor: according to DCH, Appellant "buttoned his pants" before he told DCH "he always needed something extra." Even acknowledging this point, the military judge had ample evidence, drawing every reasonable inference from the evidence of record in favor of the Prosecution, to reasonably conclude that Appellant's act of rubbing his genitals or groin area in front of DCH and speaking to DCH shortly thereafter with the manner and

tone that he did, when taken together, met the definition of indecent. Considering all the circumstances, the military judge could reasonably conclude that Appellant's conduct and words, taken together, represented a form of immorality relating to sexual impurity which was grossly vulgar, obscene, and repugnant to common propriety and tended to excite sexual desire or deprave morals with respect to sexual relations.

On the final element of the offense, given the nature of Appellant's conduct and to whom he directed it—DCH, an on-duty Air Force employee—the military judge could have reasonably found Appellant's conduct had a tendency to bring the Air Force into disrepute or lower the Air Force's image in the public esteem.

Finally, we reach Appellant's claim that facts do not establish the indecent conduct towards DCH occurred during a period of active duty or inactive duty training. We conclude that Appellant was on active duty when he committed the offense of indecent conduct against DCH. "For the purposes of Article 2(a), UCMJ, jurisdiction, active duty is an all or nothing condition." *United States v. Morita*, 74 M.J. 116, 120 (C.A.A.F. 2015) (citation and internal quotation marks omitted). When challenged, the Government must prove jurisdiction by a preponderance of the evidence. *United States v. Oliver*, 57 M.J. 170, 172 (C.A.A.F. 2002) (citations omitted). The Government introduced evidence of Appellant's orders which called him to active duty. They also presented other testimony that Appellant stayed in a particular room at the March Inn from 6 February 2017 until he was required to move rooms on 9 February 2017. DCH was certain that the incident with Appellant occurred before he moved rooms. We acknowledge that Appellant was not on active duty on 4–5 February 2017, but on those two days he also was at his home of record—two hours away—rather than staying in a lodging room at the March Inn.

The military judge found beyond a reasonable doubt that the offense occurred between "on or about 6 February 2017 and on or about 8 February 2017." If we interpret this portion of Appellant's assignment of error as a jurisdiction challenge, we conclude the Government proved jurisdiction under Article 2(a), UCMJ, 10 U.S.C. § 802(a), by a preponderance of the evidence for the offense from "6 February 2017 to on or about 8 February 2017." In our decretal paragraph, we except the words "on or about" from the findings of guilt regarding the beginning day of the charged timeframe—6 February 2017. This precludes an argument that we found factually sufficient and affirmed findings of guilt in Specification 2 of Charge I that included the time period of 4–5 February 2017 when Appellant was not on active duty.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of indecent conduct towards DCH, as amended, beyond a reasonable

doubt. *See Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt, as amended, beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for indecent conduct towards DCH, as amended, is both legally and factually sufficient.

## B. Sentence Appropriateness

### 1. Additional Background

Appellant asserts that the bad-conduct discharge he received is overly severe given the nature of the offenses and because his fitness reports from the USMC could not be obtained by the Government for his trial. On the latter point, Appellant notes "the military judge found that the Government acted diligently in trying to get Appellant's [USMC] records and that the judge would consider his missing [fitness] reports 'in a light most favorable' to the Appellant." Before this court, Appellant argues his performance reports for the entirety of his service in the USMC were seemingly lost through no fault of the Appellant and the reports showed three combat service deployments and no indication of any misconduct. Appellant argues he had only one letter of counseling while in the Air Force and only ED provided a victim impact statement which asked for him to be trained to behave politely to housekeepers and other women.

The Government points out that the personal data sheet admitted at trial shows Appellant's prior service in the USMC, his multiple periods of combat service, and the various awards and decorations he received as a Marine. The Government notes that it was Appellant's defense counsel who asked the military judge to "consider that whatever performance reports he would have had in the most favorable light to [Appellant]." The Government argues that later in the trial, the trial counsel informed the military judge that Appellant would not have received performance fitness reports until he reached the rank of Sergeant (E-5) and the Government had a document with "performance report type information on it" that could be marked as an exhibit. Apparently, this document, which was never attached to the record of trial, showed "average marks in service" at least to the point where Appellant reached the rank of E-5. After further discussion off the record between counsel for both sides, the trial counsel and defense counsel told the military judge they had agreed to leave the issue of Appellant's performance reports as "status quo as it is."

We granted Appellant's motion to attach a declaration regarding his USMC service. Appellant declares that he served nine years in the USMC and obtained the rank of Sergeant. He received three annual fitness reports, two of which "would have been average due to [his] newness in the field and one of

which an 'above average' report from his Colonel which included a comment like 'this Marine was able to accomplish task[s] that my previous two Family Readiness Officers couldn't.'" Appellant's declaration mentions several other duty-related accomplishments and concludes with "I lost my copy of my OMPF [Official Military Personnel File] when my house flooded right before I separated from service." Appellant then claims "[t]here should have been no reason why the prosecution could not have obtained copies of my OMPF, which would include my fitness reports."

**2. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

**3. Analysis**

Appellant was convicted of two specifications of indecent conduct and the maximum sentence he faced was the jurisdictional maximum of a special court-martial: a bad-conduct discharge, confinement for 12 months, forfeiture of two-thirds pay per month for 12 months, and reduction to the grade of E-1. The offenses were committed on-base, while Appellant was wearing part of his military uniform, and the victims were two female, long-time, civilian employees of the March Inn. The offenses were committed days apart from each other. After considering all the circumstances presented in the evidence, we characterize Appellant's behavior as deeply disturbing and worthy of the serious punishment of a bad-conduct discharge.

Additionally, we considered Appellant's prior service, combat service, and honorable discharge from the USMC all of which were available to the military judge prior to sentencing. We acknowledge we do not have Appellant's fitness reports that he would have received as a Sergeant in the USMC, but their absence from the record does not warrant sentence relief.

First, we see nothing in Rule for Courts-Martial (R.C.M.) 1001(b)(2) that required the Government to admit fitness performance reports from a different

service, after a break in service, in an Air Force court-martial. R.C.M. 1001(b)(2) uses the words "[u]nder regulations of the Secretary concerned, trial counsel may obtain and introduce from the personnel records of the accused . . . evidence of character of prior service." Neither side has pointed to an Air Force Instruction that required the Air Force to incorporate Appellant's USMC fitness reports into his Air Force personnel records. Appellant's comment in his declaration that "[t]here should have been no reason why the prosecution could not have obtained copies" is misplaced. By itself, R.C.M. 1001(b)(2) imposed no requirement on the Prosecution to introduce anything from his USMC records, unless those records were incorporated into his Air Force personnel records. Appellant has not attempted to show that Air Force recruiting instructions or Air Force personnel instructions imposed such requirements. To be clear, we applaud the Government's efforts to obtain these records and provide them to trial defense counsel. Such efforts contribute to the perceived fairness of the military justice system, especially if an accused has no records of the prior service and encounters bureaucratic hurdles in attempting to gather such documents for possible presentation in mitigation under R.C.M. 1001(c)(1)(B). This does not mean there was error committed under a different rule, R.C.M. 1001(b)(2).

Second, even if we accept everything in Appellant's declaration as accurate regarding his USMC service, we still find a bad-conduct discharge is not inappropriately severe. Appellant deserves notable credit for his prior combat service in Djibouti and Afghanistan. But, the record of trial already contained this information and it was properly before the military judge. Appellant's declaration adds no further notable details on his combat service. The other areas in Appellant's declaration elaborate on duty-related performance which were well covered by the other mitigating evidence contained in the record of trial.

Finally, it was Appellant's trial defense counsel who suggested that the military judge could consider "that whatever performance reports he would have had in the most favorable possible light to Appellant." We have no doubt the military judge considered the missing reports in "a light most favorable" to Appellant and still determined a bad-conduct discharge was appropriate. Appellant's declaration actually paints a less glowing picture of his USMC service than the "light most favorable" approach the military judge used. Whether we consider Appellant's declaration regarding his prior service, the military judge's "light most favorable" approach, or both, we still do not find the bad-conduct discharge to be inappropriately severe, and this court has no authority to engage in clemency. *See Nerad*, 69 M.J. at 146.

In our view, the military judge exercised leniency elsewhere by adjudging six days of confinement when the Government argued for "lengthy confinement" measured in a "number of months." We also can see that the military

judge exercised leniency towards Appellant in adjudging only a reduction to the grade of E-3, when the Government argued a reduction to the grade of E-1 was appropriate.

Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service both in the Air Force and the USMC, including his combat service, and all other matters contained in the record of trial, we conclude that the sentence is not inappropriately severe.

### III. CONCLUSION

Specification 2 of Charge I is amended by striking the words "on or about" prior to the date of 6 February 2017.[13] The approved findings, as modified, and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[13] We direct a new court-martial order reflecting our decision. Additionally, the new court-martial order will correct an error in the Specification of Charge II, by including language that was omitted in the current court-martial order that was a part of the court's finding of not guilty. The missing language includes the words "who knew or should have known that [MB] would be placed in reasonable fear of bodily harm to herself."